COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Huff and Senior Judge Annunziata

ERIC ADAM QUESENBERRY

MEMORANDUM OPINION*

v.      Record No. 1297-20-3                PER CURIAM
                                            JULY 27, 2021

GILES COUNTY DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF GILES COUNTY
Robert M. D. Turk, Judge

(Courtney Griffin Roberts; Roberts Law PLLC, on brief), for
appellant. Appellant submitting on brief.

(Richard L. Chidester, County Attorney; Zachary B. Smith, Guardian
*ad litem* for the minor children; Buckland Law Firm, P.L.L.C., on
brief), for appellee. Appellee and Guardian *ad litem* submitting on
brief.

Eric Adam Quesenberry (father) appeals the circuit court orders terminating his parental

rights to his three children. Father argues that the circuit court erred in finding that "terminating

father's parental rights was appropriate and in the children's best interests pursuant to Va. Code

Ann. § 16.1-283." Upon reviewing the record and briefs of the parties, we conclude that the

circuit court did not err. Accordingly, we affirm the decision of the circuit court.

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)).

Father and Laurianne Kristin Quesenberry (mother) are the biological parents to E.Q., L.Q., and R.Q., the children who are the subject of this appeal.[2] Father and mother reportedly married in 2012 and separated in 2018. After the parents' separation, father and the children moved to his mother's house. In September 2019, the Giles County Department of Social Services (the Department) received a complaint that father was "unsteady on his feet" when he picked up one of the children from school. The Department conducted a home visit and found that the living conditions were "not safe" for the children due to clutter in the home, mattresses "all over the floor," and black mold in the bathroom. The Department entered into a safety plan with father, who agreed to move with the children out of his mother's home and into his girlfriend's home.

On September 16, 2019, father brought the children to school late and "appeared to be on drugs" because he could "barely stand up or keep his eyes open and had incoherent speech." Later that day, the Department met with father who was "irrational" and denied any drug use.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] Mother appealed the circuit court's ruling terminating her parental rights to this Court. See L. Quesenberry v. Giles Cnty. Dep't of Soc. Servs., Record No. 1340-20-3.

Father eventually admitted to using Suboxone after the Department gave him a drug screen. The Department removed the children from father's care; E.Q., L.Q., and R.Q. were ages seven, six, and three, respectively.

The Department required father to obtain and maintain employment and housing. Initially, father was unemployed, but he later reported to be working with a friend renovating houses. Since the Department's involvement with the family, father lived with his girlfriend in her home, which the Department found to be "appropriate and safe." The adult daughter of father's girlfriend also lived in the home for a while; father, however, refused the Department's requests to conduct a background check on her because he "didn't feel the need to bring her into it."[3]

In addition, the Department required father to participate in a comprehensive evaluation, substance abuse treatment through SAFE Team services, and parenting classes. Father completed the comprehensive evaluation, which included a psychological assessment. The evaluator recommended adding substance abuse counseling to the services provided at Pulaski Medical Group, where father participated in a Suboxone program. The evaluator also recommended parent coaching for father, but if that service was not available, the evaluator suggested parenting classes for father, which he completed.

In November 2019 and February 2020, father tested positive for methamphetamine.[4] Father refused substance abuse treatment through the recommended SAFE Team, but he continued his participation with Pulaski Medical Group. When the Department advised father that he would need to "engage in more intensive substance abuse treatment because the

---

[3] In March 2020, father reported that the adult daughter had moved; the Department conducted a home visit after father's report and did not see her.

[4] Father claimed that the test was "cross-contaminated" in February 2020 because he had passed drug screens earlier that day and two days later.

Department would not return the children home to someone that was using meth or failing drug screens," father responded that he then would "never get [his] kids back."

The Department also offered supervised visitations to father who came with his girlfriend. The visits were "extremely chaotic." The Department was concerned about the children's safety because of a lack of adequate supervision. The foster mother tried to communicate with father and provide him with updates about the children, but he was not very responsive.

Because father had not substantially remedied the conditions that led to the children's continuation in foster care, the Giles County Juvenile and Domestic Relations District Court (the JDR court) terminated father's parental rights to the children and approved the foster care goal of adoption. Father appealed to the circuit court.

A few days before the October 23, 2020 circuit court hearing, the Department attempted to administer a drug test to father, but the saliva test was "rendered invalid" and father did not submit to a urine screen. On the morning of the circuit court hearing, father tested positive for Suboxone, which the Pulaski Medical Clinic prescribed for him.

At the circuit court hearing, the Department presented evidence that the children have been in the same foster home since September 17, 2019, and the foster parents were willing to adopt the children. When the children entered foster care, they had poor hygiene skills and needed help bathing and toileting. R.Q. had trouble communicating. The Department referred the children for evaluations and therapy. Dr. Alyson Hartkopf, a pediatrician at the Child Development Clinic, evaluated L.Q. and R.Q. for developmental delays and behavioral concerns. Dr. Hartkopf diagnosed L.Q. with "attention deficit/hyperactivity disorder, combined type (ADHD); oppositional defiant behavior; sleeping difficulty; and child within foster care system." Dr. Hartkopf initially prescribed medication for L.Q.'s ADHD and subsequently prescribed him

medication for anxiety and sleeping. Dr. Hartkopf diagnosed R.Q. with ADHD and prescribed medication for him.

In addition, Dr. Hartkopf found that L.Q. and R.Q. had speech and developmental delays when compared with other similarly aged children. Dr. Hartkopf referred L.Q. and R.Q. to speech and occupational therapy and recommended that both children continue with play therapy. By the time of the circuit court hearing, L.Q. and R.Q. had made "significant progress . . . in catching up" with their peers developmentally, and all three children's hygiene had "drastically improved." L.Q. and R.Q. had been discharged from speech therapy, and L.Q. had been discharged from occupational therapy.

Another evaluator diagnosed the children with post-traumatic stress disorder and recommended that they continue with therapy to work on social skills, healthy attachments, and regulated behaviors. To supplement the children's therapy, the Department provided in-home services to the children to assist them with anger management, impulse control, and sibling conflict.

Due to L.Q.'s special needs, the Department referred L.Q. for an independent evaluation, which was completed in May 2020. The evaluator diagnosed L.Q. with reactive attachment disorder and found that he was "severely neglected" while in the care of mother and father. The evaluator opined that L.Q. would need therapy for years and stressed that L.Q. needed a living environment with "consistent, stable love and consequences and discipline." The evaluator testified that L.Q.'s prognosis would be "very poor" if he returned to "his original home," but his prognosis would improve if he remained in foster care and was adopted.

Throughout the case, the Department expressed concern about father's drug use and his ability to manage the children's behaviors. Father had displayed "extreme hostility" toward the Department and foster mother while the children were in foster care. Moreover, father did not

contact the children's counselor, therapist, occupational therapist, or speech therapist to ask about the children.[5]

At the conclusion of the Department's evidence, father moved to strike, which the circuit court denied. Father admitted that he had a "drug problem" and sought treatment at Pulaski Medical Group. Father met the criteria for "severe opioid use disorder" and qualified for Suboxone therapy. Father also was assigned an individual counselor at Pulaski Medical Group and was subject to drug screens. On October 1, 2020, father tested positive for methamphetamine and amphetamines, although he testified that he was unaware that he had tested positive.

Father testified that he had been unemployed for approximately two and a half months before the children were removed, and he remained unemployed after the children entered foster care. Father explained that he had held one job for two weeks until he had "scheduling issues with visitations." At the time of the circuit court hearing, he had been working for a construction company for approximately two months.

Moreover, father acknowledged that the children still needed services, especially counseling. Father believed that the children's behaviors had deteriorated since they entered foster care. Father testified that before the children entered foster care, they were "happy-go-lucky," and he did not see the same concerns, such as an inability to bathe themselves and brush their teeth, that the therapists and foster mother described. When asked about the differences in their behaviors, father told the circuit court that the children will "play the fool if they like." Father wanted the children to return to his care, and he was willing to continue any necessary services for them.

---

[5] Father testified that he had asked the Department for the contact information of the children's counselors and therapists but "was never provided it." The social worker denied father's claims.

After hearing the evidence and arguments, the circuit court terminated father's parental rights under Code § 16.1-283(C)(2) and approved the foster care goal of adoption. This appeal followed.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Father argues that the circuit court erred in finding that the Department's evidence was sufficient to prove that termination of his parental rights was "appropriate" and in the children's best interests.[6] Father emphasizes that he substantially remedied the housing issue, which the Department conceded at the circuit court hearing. Father also stresses that he completed the parenting classes and comprehensive evaluation. In addition, he had addressed his substance abuse issues with the Pulaski Medical Group. Father asserts that his actions "prove[d] his dedication to his children" because he attended visitations and meetings related to the children. Lastly, father contends that the Department "encountered this family as they emerged from the

_____

[6] While father's argument focuses on termination of parental rights under Code § 16.1-283(C)(2), he also mentions termination under Code § 16.1-283(B). The circuit court did not terminate father's parental rights under Code § 16.1-283(B), so we will not address that portion of his arguments.

- 7 -

trauma of [the parents'] separation," and it was not in the children's best interests to be permanently removed from father and mother.

The circuit court terminated father's parental rights under Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 552 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)).

The circuit court acknowledged that father's housing was no longer a concern, but father still had "some real issues with drug abuse" and needed to "take some different steps" to treat his substance abuse. Since the children entered foster care, father had tested positive for methamphetamines several times while he was participating in the Pulaski Medical Group.

The circuit court, however, was most concerned about the children. The circuit court heard evidence that the children suffered from post-traumatic stress disorder and that the parents were probably triggers for the children. When L.Q. and R.Q. entered foster care, they had developmental and speech delays, which father had not recognized. The circuit court stressed that L.Q. was diagnosed with reactive detachment disorder due to "severe neglect" and that the prognosis for him would be "devastating" if he were returned to his parents. All three children participated in therapy while in foster care, and L.Q., at least, would need years of therapy. Despite father's arguments that his actions proved his dedication to his children, he never

contacted the children's counselors or therapists. The circuit court found that the children "have some issues and they haven't been dealt with properly by [mother and father] when they were in [mother's and father's] custody." The circuit court further found that there was no evidence that the parents could handle the children's issues in the future.

At the time of the circuit court hearing, the children had been in the same foster care home for thirteen months. Father did not recognize the children's delays and told the circuit court that they could "play the fool if they like." The circuit court rejected father's testimony that the children were "pulling a fast one" because they had been in counseling and services for more than one year and could not "con all these specialists for a year." The circuit court found that the children were "making progress" and "have to remain in foster care." Father was not in a position to resume custody of the children. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Considering the entire record, the circuit court did not err in terminating father's parental rights under Code § 16.1-283(C)(2) and finding that termination was in the children's best interests.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.